Charles Marks, J.
Defendant Rebecca Issachar moves for an inspection of the Grand Jury minutes and for a dismissal of the two informations, one found solely against her and the other against her and another. These informations had been directed by the Grand Jury to be filed with the Clerk of the Court of Special Sessions.
*827 The charges and the specifications of the informations are intended to denote a violation of section 487-a of the Penal Law and sections 371 and 374 of the Social Welfare Law.
The information lodged solely against defendant Rebecca Issachar charges her, generally, with receiving compensation for the placing out of children, that is, she, as a person unauthorized by law, did “place out” children and “unlawfully did request, receive and accept a thing of value for placing out a child.” Relative to specific instances of the “ placing out ” of a particular child, the information contains additional counts alleging misdemeanors of ‘ ‘ receiving compensation for the placing out of children ’ ’ and the ‘1 unauthorized placing out of children.”
The other information lodged against Rebecca Issachar, the moving party herein, and against one Maurice Issachar, a lawyer, practicing in Athens, Greece, and by reason thereof not before the court as an appearing defendant, alleges a conspiracy to violate the same statutes. In substance, both defendants are generally accused therein of conspiring for the purpose of “ placing out of children ” and also of “ unauthorized placing out of children.” Included in this information are additional substantive counts charging them with specific instances of receiving compensation for the “placing out ” and for the 11 unauthorized placing out ” of a particular child.
The accusation of unlawful11 placing out ’ ’ came about as the result of adoption proceedings instituted and completed in Greece by residents of this State and then having the children of these proceedings brought to this State into the homes of these adoptive parents.
The adoption of children within the jurisdiction of the Greek Government by United States citizens is conceded by the District Attorney to be legal. This concession appears on page 14 of the memorandum submitted by the District Attorney in opposition to a motion in other litigation (the Scopas case, 24 Misc 2d 832), decided simultaneously with this motion. His admission reads as follows: “ As was stated by the District Attorney of New York County then (New York Times, May 5, 1959, p. 1, col. 4), the legality of such adoptions could not under comity be challenged.” See, also, the New York Times (May 5, 1959, p. 24, col. 3), in which the District Attorney of New York County is quoted as having stated that “ these ‘ proxy adoptions ’ were legal in the Greek courts ” and that “ ‘ adoptions are recognized here as legal. ’ ”
A further admission or concession concerning “ placing out ” also appears in the District Attorney’s memorandum. On page *828 5 he unqualifiedly admits that the services these defendants performed subsequently to adoption “ certainly did not of themselves constitute a ‘placing out.’” (Emphasis supplied.)
Inasmuch as I am basing my decision entirely upon the question whether the evidence adduced before the Grand Jury was legally sufficient to Avarrant the direction for the filing of these informations pursuant to the applicable penal laws of this State, there is no need for a discussion of the point whether the supremacy clause of the United States Constitution, the “ Federal Orphan Program ’ ’ embodied in the ‘ ‘ Refugee Relief Act of 1953 ” (67 U. S. Stat. 400) and the amendments thereto, and any other statutes enacted thereafter, affect the validity of the New York State statutes in their regulation of the manner and the procedure by which children may be adopted.
Directing my attention noAv to the Grand Jury minutes, I find that, according to the evidence, in each instance where a child is purported to have been “ placed out,” such child had already been legally adopted in Greece by adoptive parents residing in this country. After the consummation of a legal adoption in Greece, the adopted child, in each instance, would then leave Greece, enter this country, and proceed to live with its adoptive parents. In no instance did the adoptive parents of any one of these children ever have custody of the child or provide care prior to a consummated adoption in Greece, and in no instance were the adoptive parents ever cast in the role of foster parents.
Subdivision 3 of section 487-a of the Penal Law, and subdivision 12 of section 371 of the Social Welfare LaAV, define “ placing out ” in identical language, as follows:
“ As used in this section [one section stands also for the other] the term placing out shall mean to arrange for the free care of a child in a family other than that of the child’s parent, stepfather, grandparent, brother, sister, uncle or aunt or legal guardian, for the purpose of adoption or for the purpose of providing care.” (Emphasis supplied.)
It thus appears from the unambiguous language employed in the like statutes (ibid.) that it is unlawful for an unauthorized person ‘ ‘ to arrange for the free care of a child * * * for' the purpose of adoption or for the purpose of providing care.” Regarding that particular phase of the statute dealing with “ free care * * # for the purpose of adoption,” such care must necessarily precede the act of adoption, for if it were otherAvise, the phrase “ for the purpose of adoption” would be rendered meaningless.
For emphasis as reflecting on such interpretation of the statutes in question as to adoption, it is to be noted that the *829 syntactical arrangement of the phraseology in the context places the word “ purpose ” after the words “ free care ” and before the word “adoption.” From this sequence of language, it follows that care must take place before the act of adoption. This construction is logically borne out by the meaning of the word “ purpose ” lying between them. In its specific application here, the word “purpose” is defined as, “The object, effect, or result aimed at, intended, or attained” (Webster’s International Dictionary).
In this connection, it is appropriate to point out that under subdivision 7 of section 112 of the Domestic Delations Law, the adoption of a child under the age of 18 years cannot take place “ until such child has resided with the foster parents for at least six months unless the judge or surrogate * * * shall dispense with such period of residence ”.
As to that part of the statute concerned with “ free care * * * for the purpose of providing care ” (keeping in mind that the word “purpose” lies also between these phrases, it designedly indicates legislative awareness that foster-home care might be ostensibly provided by persons who would obtain custody of children but without an actual intention to adopt or who would obtain custody but with the intent to adopt only when compelling circumstances might call for it at a later time.
On the basis of the evidence presented to the Grand Jury, it cannot, therefore, be said that there was an arranging in violation of the statute either for “ free care ” or for the furnishing of “free care.” The care contemplated and the care furnished were to come from, and did come from, adoptive parents, who were then fulfilling by law their legal and moral duty as such legalized parents. That this is so, emanates from the relationship that the foster child assumes toward the adoptive parents, and toward the natural parents, to wit, the status of a natural child toward the former by virtue of the adoption proceedings, and that of a stranger toward the latter by legal severance, so far as any legal obligations are concerned (Matter of Pierro, 173 Misc. 123; Matter of “Wood” v. “Howe”, 15 Misc 2d 1048). In consequence, adoptive parents become clothed in law with all the responsibilities of natural parents (Domestic Delations Law, § 115, and annotated cases thereunder) so that a failure by them to provide care for such child after its arrival in this State to be taken into their custody, as in a case like the present one, would subject them as legalized parents to punishment under section 480 et seq. of the Penal Law. The conclusion therefrom is that it would be an absurdity to hold that care furnished by an adoptive parent is “ free care ” *830 as that of a nonparent within the meaning of the statutes in question.
The contention of the District Attorney that the affirmance of the judgment of conviction in the case of People v. Slater (279 App. Div. 1042, affd. 304 N. Y. 896) sustains the argument that section 374 of the Social Welfare Law with respect to 11 obtaining the services of an intermediary for the purpose of finding adoptive parents, that is, the placing out, must be made or done by the parent ” or by an authorized agency, is without merit. The facts in the cited case are readily distinguishable from those in the instant case. The use of the words “ placing out ” in the charge of the trial court quoted from the cited case by the District Attorney in his brief, takes the case at bar out of that category, because there was no “ placing out” within the meaning of the statutes in question in the case under consideration.
The case of Matter of Anonymous (286 App. Div. 161), another authority cited by the District Attorney in his memorandum, clearly has no bearing upon the facts in the case at bar. An examination of the record in that case, proves the facts therein also to be distinguishable from those appearing in the instant case. In the Grand Jury minutes of this case, there is no testimony, as in the Anonymous case (supra, p. 166) of “ a demand for money as the price of the surrender of a child for the purpose of custody, pending adoption,” nor is there any testimony showing a ‘ ‘ demand for money as the price of a consent to the adoption itself.”
At this point, it will not be amiss to make the observation that in this present day and age of abnormal world-wide stress, it cannot be gainsaid that inter-country adoptions, when properly supervised by official authority, are deserving of laudatory commendation. That recognition of this view on the subject of adoptions was publicly given by high authority, is best attested by the passage in Congress of emergency legislation for the admittance of 100,000 immigrants a year for two years following the sending of a letter addressed to Congress by President Eisenhower on April 22, 1953, in which he had urged the enactment of such legislation to meet a then existing international emergency. This step taken by Congress resulted thereafter in the adoption of a statute which, in time, became popularly known as the ‘ ‘ Refugee Relief Act of 1953. ” (67 U. S. Stat. 400.) And, a vital part of this bill of enactment became known as the “ Orphan Program.” Then, in September, 1957, Congress passed an amendment to the Immigration and Nationality Act, recorded as Act September 11, 1957 (71 U. S. Stat. *831 639; U. S. Code, tit. 8, § 1205). Its aim was the granting of a non-quota immigration status to alien children under 14 years of age adopted by United States citizens abroad or those immigrated to this country for adoption here. In this legislation, Congress declared, inter alia, that an ‘ ‘ eligible orphan ’ ’ was one who was lawfully adopted abroad by a United States citizen and his spouse.
Despite the fact that thousands of children were fortunate by human kindness to become recipients of homes with adoptive parents in this country as the result of the legislative acts of Congress, hailed by the President as significant and outstanding humanitarian measures, I decry the method used by these defendants to obtain the legal adoption of these children.
It seems that the operation of some sort of “ black market ” prevailed in the placing in foster homes of unwanted infants and that the operation turned into a flourishing business — an evil, if presently existing, that calls for supplemental legislation of a more effective remedial nature. But, so far as I, as a Judge, am concerned, I, for my part, have no alternative other than to follow the law as it is now written (see People v. Grant, 14 Misc 2d 182).
The principles of law dealing with the construction of penal statutes, have been definitely defined.
Penal statutes are to be strictly construed, and acts otherwise innocent and lawful do not become criminal unless there is a clear and positive expression of legislative intent to make them criminal, so that ‘1 he who runs may not only read but readily understand” (People v. Farone, 308 N. Y. 305, cert, denied Far one v. New York, 350 U. S. 828; People v. Broady, 5 NY 2d 500; People v. Adamkiewicz, 298 N. Y. 176; People v. Dioguardi, 8 A D 2d 426; People v. Pestronk, 3 Misc 2d 845). As stated in People v. Dioguardi (supra), at page 435: “ Under the American system of law, even the most corrupt and reprehensible individual may not be deprived of liberty unless Ms guilt is established within the confines of an applicable penal statute. A desirable end can never justify the use of impermissible or improper means.” (Emphasis supplied.)
Further, words employed in penal statutes should be given their ordinary and usual meaning and in no circumstances is the court warranted in construing such a statute to make out a crime by implication or by extending the expressed legislative intent by judicial interpretation (People ex rel. Janosko v. Fay, 6 N Y 2d 82; People v. Glubo, 5 N Y 2d 461). However praiseworthy the legislative purpose may be, the courts may not, particularly when dealing with penal statutes, mala prohibqtq *832 enlarge upon the statutory language so as to make criminal what is not plainly written. Judicial legislation is beyond the power of the courts, for judges only expound the law, they do not make it (People v. Grant, 14 Misc 2d 182, supra). “We must read statutes as they are written,” wrote Fuld, J., in People v. Kupprat (6 N Y 2d 88, 90), “ and, if the consequence seem unwise, unreasonable or undesirable, the argument for change is to be addressed to the Legislature, not to the courts.”
For the reasons afore-stated, I am of the opinion that the evidence does not spell out any crime within the meaning of the statutes involved.
Accordingly, the informations are dismissed. Submit orders.